All right, let me ask you as a threshold matter, you filed a few days ago this motion to disqualify counsel on the other side, and the panel called for a response, and there was a response, you know, filed, et cetera, et cetera, we did not rule on it preemptorily before coming and we carried it with the case, so it's here, so my question is, is this issue still alive and something that we have to address, or are we on to the merits? The issue is alive, we have sought to disqualify Mr. Robinson and Lisco and Lewis from handling the matter on behalf of Nadel & Gussman against Lisco and Lewis's former client, Enable, our current client, where they represented Enable in the establishment of the storage facility, the underground storage facility that is at issue in the litigation. We did not discover, first of all, I don't believe Lisco and Lewis was in this case when it was in the district court, they came into the case in the Court of Appeal. They're also in a state court proceeding that is going forward that relates to these issues, and we had thought that the issues of conflict and disqualification would be resolved in that state court proceeding. There was a hearing scheduled in early October, then another hearing scheduled, and then it was removed, and then we're here. And so when it didn't get resolved, we raised the issue in this court as well. My client will not waive the conflict, and consequently seeks to disqualify the firm of Lisco and Lewis, and Mr. Robinson, who is a member of that firm, from representing Nadel in this matter against its former client. It's substantially the same, it's the same issues, it's the same facility, it's issues concerning what that facility is and what rights that facility has, and there is also the issue concerning confidentiality. Mr. Robinson has indicated they don't have files that they say contain confidential information,  and that's the rule. The way the rule works is that if it is reasonable to assume that confidential communications were made in connection with the representation, then those confidential communications give rise to the conflict. Of course, Mr. Robinson didn't handle the matter. It was Lisco and Lewis and their other attorneys at Lisco and Lewis, some of whom are deceased, at least one who was not. But it is imputed to all members of the firm, as though it were one lawyer. I saw some reference to a confidential or seal, or I don't know what word to use, or a letter of counsel attorney Gene Lafitte. What's going on with that? Well, we have provided, since that motion was filed here, we've provided a redacted copy of that letter to Mr. Robinson. We have a number of pieces of communication, providing instruction as a lawyer would do in attorney-client privilege communications from Lisco and Lewis that we consider to be privileged and don't want to produce to the people against us. Whether they have them in their files or not is really not the question. We were just trying to demonstrate that those types of communications were had. A major question was raised because Gene Lafitte is, I think there was some suggestion and argument that this imputed conflict goes away with death. And I don't think it does. My understanding of the conflict's rules wouldn't cause that to happen. But Gene Lafitte's not dead. I know he's not. I've seen him. And he's an active lawyer. I know that too. And he is on a letter and we provided a redacted copy of the letter. We took out the advice and counsel of the attorney, but to show that the letter does exist. So, because the question was raised as to whether, about the letter, and I just didn't want that to be a question any longer. All right. I just wanted to be sure for the panel that, A, the issue was still alive. And, B, if anything had occurred since it was filed. And, in fact, it has, the redacted piece of information you just alluded to. Excuse me. I'm sorry to interrupt you. No, I was just going to say so to the extent that it's there. I mean, it'll be part of our deliberations about the whole matter. And to the extent you want to speak more about it, you can. But otherwise, assuming if we got past that, you know, you can spend the balance of your time on the merits. And when Mr. Robinson comes up, we'll ask him similarly about the motion and so forth. And you'll have the time to rebut. And at the end of it all, we'll have as good an understanding as we can as to whether, A, whether the motion should be granted. And, B, even if it is, what difference it may or may not make on the merits determination. Well, may it please the Court on the merits. And just as a matter of introduction, I'm Larry Shea. And I'm here on behalf of Appellant Enable Mississippi River Transmission. It's an appeal from the United States District Court for the Western District of Louisiana, the Honorable Judge Elizabeth Foote presiding. And it's an appeal from her order granting a 12B1 motion and dismissing Enable's lawsuit for lack of subject matter jurisdiction. So that's the issue. Was that done in error? The standard of review is de novo. It is our position that the issue is one. There is an issue of federal question jurisdiction, that there is federal question jurisdiction under 28 U.S.C. 1331. There is a substantial issue of federal law arising out of the Natural Gas Act. What do you do with the Learjet opinion last year from the Supreme Court that seems to me to say that regulation of the production and gathering of natural gas is left to the states, is not a matter of federal law? Well, regulation and production of the initial production of natural gas is. Production and gathering. Production and gathering. There's no question. If you look at the One Oak case, One Oak versus Learjet, you'll see that they divide the natural gas industry into three segments. The segments are, first, the production of the gas, and they talk about historically going and drilling the wells, no storage facilities, no storage gas, drilling wells, producing gas, and then delivering that gas to interstate commerce. And then you have interstate pipelines that then transport the gas, and then they take it to the customers, and then the customers are normally local users who then distribute to residences and businesses. We're in the middle. We're in the middle of that, and this case does not infringe in any way upon the state's regulation. Let me just go straight to the heart of it, and I think you've got to the heart of it, is that in this particular matter, you have a case that the district court relied upon almost exclusively and that the other side relies upon almost exclusively, and it's a Ninth Circuit decision in Williston Basin. That's really where the case comes down to is that, and we don't think that decision's right, okay? And it's an interesting decision, so let me just talk about it. What's wrong with the decision is this. It got it right on the condemnation issue, because in that case, Williston was seeking a condemnation of some wells. The defendants in that case had drilled some wells within the geographic confines of their storage facility, and it was the allegation of Williston that the wells were producing their storage gas. And then they filed a suit for conversion damages, a state court suit, and they also filed a state court claim for condemnation of the wells. And on the condemnation issue, they argued that the wells did not constitute an extension of the storage facility, and they lost, Williston lost that argument. It was an extension of the storage facility, those wells were. And for them to take those wells over and use those wells for purposes of their storage facility, they would have to get a certificate of public convenience and necessity from the FERC. Well, they'd argue that it wasn't an extension, so it would be hard to argue it was, when it was in the hands of the defendants. The second part of the decision in Williston was this. The Williston court said that the production basically, you've shown no part of the Natural Gas Act that applies to the conduct of the defendants. And the second part of it is, and the production exception, the one you mentioned, applies. So the Natural Gas Act doesn't apply to what they were doing. We disagree. We disagree. The production exception applies to initial production. It applies to native gas that's in the ground. The permits and the orders that were issued by the Department of Conservation to Nadel and Gusman, in this case, are permits where they were trying to conserve and protect the natural resources of the state of Louisiana. The gas that they're producing, as we allege, is not the gas and resource of the state of Louisiana. It's gas that's been produced in Missouri and Arkansas and Texas and other places and has been put in storage. It is gas that is declared under the Natural Gas Act as being gas to which Nadel is entitled to possession and control of that gas until it is, after delivery into its system, until it, that is, Nadel, delivers it to their customers. Now, that's the gas they're producing, not native gas. Remarkably, no one argued that in Williston. Just wasn't argued. And then the other point is, as they say in Williston, well, you don't point out a violation of the Natural Gas Act that occurred on the part of the defendants. Well, they couldn't point out the violation because they took the other side of the issue wrongfully, that those wells weren't an extension of the facility. They are an extension of the facility. If Enable wanted to use Nadel's sandalwood well to withdraw gas from its storage facility, Enable would have to get a revised certificate from the FERC. Have you argued this before? Yes, it's in brief. They'd have to get a revised certificate from the FERC. That's what they say in Williston. That's the way it is under 15 U.S.C. 7, I think it's F.C. 1A. But it's cited in the brief. If you're going to be a natural gas company or a person who's going to engage in construction or extension of an existing facility or engage in construction of a storage facility, you have to have a certificate of public convenience and necessity from the FERC. Now, Nadel responds to this argument by saying, well, we're not a natural gas company. I got that. But that doesn't mean you're – and therefore they're not subject to FERC regulation. Their conduct is subject to FERC regulation. The sandalwood well is an extension of our storage facility. It's producing our storage gas. If we did it, Enable did it, we'd need a certificate. The fact that they didn't get a certificate means they are engaged in unauthorized conduct. And there we get back to the state claim for conversion. To have a state claim for conversion, you have to show they weren't authorized to do what they were doing. You have to show that. And that's the federal law that's at the heart of this lawsuit, is that they weren't authorized under the Natural Gas Act to drill a well and produce. They call it production. I call it withdrawal. They weren't authorized to withdraw storage gas and sell it. It's that simple. It may not be that simple if you're arguing production exceptions and you've got Williston cases and all this. But it's an issue the federal courts should address. You don't want this decided on a state-by-state basis. The FERC is regulating Enable, as it does every other natural gas company, is regulating their rates. The rates that they charge, that they're allowed to charge, are based upon the costs they incur. The losses they sustain go into that cost basis. It's a burden on interstate commerce. And let me just say how far out the position is. NATO's position is I've got a permit to drill the well, I've got a unit order from the state that says I'm draining a unit. That's not the facts in this case, because you have to assume the facts in the case of what we allege. And what we allege is they drilled a well and they're producing the storage gas that's migrating to that well from our facility. It's not what the state said. And the problem with the position of NATO that makes it so extreme is that NATO, what if they'd studied it and knew that the Vaughan sand, the rust and Vaughan sand that they completed in had been depleted years ago? But they also had studied it and knew that storage gas was escaping and coming to their well site. They knew those things and they drilled the well and they produced it. Let's say that were the case. It wouldn't make a difference to NATO's argument because it's a production exception and we're not a natural gas company. So if you can figure it out, it's a great deal for you, because someone's going to keep injecting storage gas into a facility that's coming over to your well that's depleted and you're going to produce it and sell it. All right, Mr. Chairman. We'll stop you right on that point. You've got a red light. You, of course, reserved some rebuttal time. I did. I reserved rebuttal time. Yes, Your Honor. Thank you. Thank you, sir. Mr. Robinson, you're up. And similarly, I'd just ask you to address the motion. May it please the Court, Your Honors. George Robinson, Lisco and Lewis in Lafayette. Your Honor, first of all, we're here, as I understand it, on a jurisdictional question, subject matter jurisdiction. Judge Foote never got to the merits. In fact, she said that I'm pre-permitting NATO's other arguments. So as far as this case is concerned, the underlying facts, the prior representation of Austin Lewis before the Commission of Conservation in 1968 is really, I don't think, before this Court. But in any event, to address the conflict issue, there is no conflict, Your Honors, and here's why. Austin Lewis was one of the founding partners of our firm. Mr. Lewis has been dead since November of 1974. He represented the predecessor to the appellant, Enable, in 1968. And what didn't come out on counsel's earlier argument, there were actually, it was not just a federal certificate of convenience and necessity. What Mr. Lewis did was to get a unit order from the Department of Conservation in Baton Rouge to set up the parameters and the size and the boundaries of the subject gas storage unit. There's another order that established the Sanderlin Well as the unit well for the Vaughan Sand, and that's where the allegation is. But on the conflict, we took the position early out. When we got into this case, we came in, in fact, as far as the conflict goes, we weren't even in the case when this appeal lodged. So the only thing we've dealt with on this appeal is the subject matter jurisdiction issue, and I don't see the conflict there because Mr. Lewis never represented Enable's predecessor in litigation. So moreover, Your Honors, when we went into the state court claim, we accepted that this was a collateral lawsuit in state court in the third judicial district in Ruston was a collateral attack on the order of the Commissioner of Conservation because if the first thing they should have done was gone before the Commissioner, which they have now done, they have gone before the Commissioner and they are long subsequent to the filing of the two lawsuits, to ask that the gas be tested and measured and so forth. So right now on the merits, nobody knows who's draining who or who's migrating from here to there. Migration was not an issue when Austin Lewis represented the predecessor of the appellant. What is relevant now is they've got to go back to the Commissioner of Conservation to revise these units. If there's migration, revise the size and boundaries of the gas storage unit and the drilling unit, if in fact there is migration. When, Your Honors, when we come back to the litigation, if it goes back, the only issue is going to be how much gas and the value, whether those claims have prescribed, because it was testimony at the most recent conservation hearing a couple of months ago that they've known about the so-called migration for 30 or so years. But nothing that Austin Lewis did in forming these units will be relevant in the litigation. But the other thing, Your Honor, is that in the litigation. He seems to argue that the nature of the merits dispute, Mr. Shea argues, I think, is not dispositive of a conflict. His argument, as I got it in the papers, is that there's an inherent conflict because of the predecessor in this going loose with the named client by whatever its earlier name, and I may be oversimplifying, but that if that conflict was there, it sort of survived whatever iterations of the merits of the lawsuit, et cetera, et cetera, so that he's arguing the present circumstances can't sort of purge any conflict that might have been there, I think, in essence. So my point is, so you don't get too bogged down in the deeper areas of the drilling, but just on his front-end attack on conflict and what do you say about this document that's, Your Honor, that's been redacted relative to Gene Lafitte, et cetera. Okay. That document was a transmittal letter sending the outline that Mr. Lewis was going to use to the client. It was the outline that he was going to use in examining his experts, which, Your Honor, I've read the transcript. It's almost verbatim as a matter of public record. This is something going back to pre-'74? This is a document by Austin Lewis? There was a document that Gene Lafitte was helping Austin work the case up, and Gene wrote the letter, but this goes back to 1968. Judge, if I could, if I could refer the court to document number 00513732438 in this court. That's our brief that we, a state court brief that we attached to our brief in opposition to the motion to recuse. And the Walker case in the State Supreme Court said that they were talking about, and if I could, I would like to read it in the record if possible. The Supreme Court said, as a result, the court has held that, quote, if the attorney is to be disqualified, there must also be an indication that the confidential information obtained by the former attorney is relevant and can be used against the former client in a subsequent proceeding. Your Honors, we withdrew immediately when we discovered that Austin had represented an able predecessor. We have withdrawn and gotten new counsel in the conservation matter because we would have, in that case, had to take a position opposite to what Austin had taken as to the question of a closed versus open reservoir. That's not going to be an issue because if it's done properly under the law, under the Gotti case, and the, which I was involved in, the Supreme Court case, they've got to go to the commissioner. Then, if they're not satisfied with what the commissioner does, they have to file a suit in the 19th Judicial District Court under Louisiana revised statute 30-colon-12-B. And that was exactly the issue in the Gotti case. We won it in the 19th District. First Circuit reversed us and then the Supreme Court granted writs and reinstated the district judges. So, Judge Stewart, does that answer your questions? Okay. And on the merits, again, what Judge Foote found was this was a state law conversion case and the dual drilling case that we cited in brief, Your Honors, in our opposition motion, is a Louisiana Supreme Court case in 1998 where they found in looking at the nature of a conversion claim and they returned to the civil code and the civil law and they found that a conversion claim is a tort. It's an intellectual action under Louisiana civil code articles, including 2315. So it requires a finding of fault. And here, Judge Foote found that there was no violation, there's no private cause of action for a violation of the Natural Gas Act, but it's not just the Natural Gas Act and the certificate that's involved. We've got two units. So this is a peculiarly, it's a state court matter because they can get another certificate of convenience and necessity, but there's no law that says that there's a cause of action, there's federal jurisdiction for a violation of the Natural Gas Act. And finally, Your Honors, the production, as far as the production exception, my client's production is native gas. So we suggest this is a state court matter and there's no federal jurisdiction. And, Your Honors, if there are any questions, I'll be glad to take them. You're saying it is native gas? My gas is native gas that I'm producing, Judge, under the Senate of the number one well. Now, they claim we're also producing some of their gas in storage, but our gas is native gas. That's the way the unit was set up. It was the drilling unit for the Vaughan Sand. Is it customary to allow drilling through a storage facility like this, or is this an unusual thing? Your Honor, I can't answer that. I don't do conservation work, but there was a modification to the unit in order to let some casing be run through. But as I understand it, they're separate reservoirs. There are separate reservoirs, and that was the issue. And on the conflict issue, if I can return to that just a second, but with reference to the merits, when Mr. Lewis formed the unit, the conservation department, the Louisiana Conservation Department, found that the storage unit was a closed reservoir. Well, apparently it wasn't a closed reservoir because I don't think there's any question about it, as between the two companies or Mr. Shea and myself, there is migration going on now from which to which, which reservoir to the other hasn't been decided. That is being tested and is really not an issue before the court today. All right. What do you say to his argument? Maybe you've already answered it, but tell me again. He is arguing that somebody is getting an extension of the storage unit, of the storage facility, and therefore federal law is involved in deciding whether or not to go ahead. To my knowledge, Judge Davis, there's been no application to the federal government. The only thing federal right now is this lawsuit. Everything else, they're in state court and we're arguing the motion disqualifying my exceptions Monday, and then they have also applied to the commissioner, as they should have done in the first place, to measure the gas and one would assume that the commissioner has sole jurisdiction under 30-4, the revised statute. He's got sole jurisdiction over oil and gas matters in the state of Louisiana, and presumably he will, if there is migration of gas, the commissioner will make a finding and he will revise one or both units. If, in fact, we're draining them or their gas is migrating to us, he'll take action. He can shut in wells, he can require other wells be drilled, but that's solely the jurisdiction of the commissioner of conservation under 30-4 of the revised statute. Nothing has to be done under the NGA. That's our position. What is his position? Well, he says that under the NGA there's federal jurisdiction, as I understand it, and we say there's no private cause of action under the federal jurisdiction of the National Gas Act, I'm sorry, and that's what Judge Foote found. All right. Thank you, Mr. Roberts. Thank you, Your Honor. Jay, back to you for rebuttal. Thank you. The issues that were approached with the commissioner by Lisko and Lewis years ago are many of the same issues that are involved in this matter. You'll see them allege that the commissioner found that the facility is a closed reservoir. That's going to be an issue. What that means? Austin Lewis did it. Gene Lafitte helped him. And they did it on behalf of my client, and now they're representing someone else and using that, and they argue it in their brief in this court. That's at page two of their brief. So we believe that a conflict does exist, and they should be disqualified. His client says, and he says, our production is native gas. No, it is not. So if they're disqualified, where does that get you on the merits of the issue? I don't think it affects the merits, Judge. So if they're disqualified from the case. They're disqualified from the case, and Nadal and Gusman need to get other counsel. That's where it gets them. But then we'd be back on appeal with somebody else. Well, I don't know that that's the case. You know, we're here where the arguments, the briefs have been done. I don't know what the effect of the conflict except the disqualification at some point. If we determine your argument about disqualification was meritorious but didn't find that your argument on the merits was meritorious and affirmed the district court's dismissal, that would be the end of it? I believe it would be. I didn't say that's what we're going to do. I'm just asking. Well, I believe it would be. Okay. I don't know what the effect of the person with the conflict arguing the case is. I don't know that's ever been addressed. I do want to get to a couple of things said on the merits. One, he says his client's production is native gas. It is not. And the reason I can say that is because we allege it's storage gas, and you have to accept our allegations as true for purposes of determining jurisdiction, subject matter jurisdiction. So they aren't. It's not in this case, not right now. That may be something on the merits that they want to argue, and that's another thing. You can't go to the merits, and they keep going to the merits of the claim. You can't go to the merits of the claim and then rule that it's a lack of jurisdiction, subject matter jurisdiction. There's subject matter jurisdiction in this case. We'll argue the merits when we present evidence. No evidence was presented. They just don't want to pay damages. They're in the state court saying we can't go there. They're in the federal court saying we can't come here. They're all saying we have to go to the commissioner, and the commissioner can't award damages. Isn't that uniquely different? They're just saying there's just no remedy. They could have intentionally drilled a well to drain the storage gas of our facility and produced it with impunity and sold it and made millions of dollars from that gas, which wasn't theirs. They could do that without consequence, according to their arguments. In this case, federal jurisdiction exists because the Natural Gas Act requires that any extension of its facility, of a facility, can only be done if you have the appropriate certificate. They're not a natural gas company, and I refer you to, again, 15 U.S.C. 717 FC1A. No natural gas company or person can do this without a certificate. That's what it says. A federal certificate. Without a federal certificate, which means their conduct in draining the storage gas and selling it through that well is without a certificate. It is unauthorized, and it's that unauthorized conduct under federal law that gives rise to the conversion claim, because that's an element of conversion. You don't have the right to take it. And that's the reason why there's a federal question in this case, a significant one, a substantial one, a one that's being disputed, and one that should be addressed by the federal courts. All right. Thank you, Mr. Chair. I believe we have your argument on both aspects of the case. We appreciate the briefing and argument. We'll take it under submission along with the other cases that were argued this week and the non-orally argued. This completes the work of our panel, and we will stand in adjournment.